## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 2:12-cr-00418-DCN-1 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| ERIC LARON BROWN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter comes before the court on a motion to suppress brought by defendant Eric Laron Brown. Brown alleges that the traffic stop and subsequent search and seizure of his person on March 5, 2012 were unconstitutional under the Fourth Amendment and contends that the evidence seized must be suppressed. For the reasons set forth below, the court denies Brown's motion.

## I. BACKGROUND

A federal grand jury indicted Brown on four counts of knowingly passing counterfeited Federal Reserve Notes, one count of possessing with intent to distribute and distributing marijuana and cocaine base, one count of possessing with intent to distribute cocaine base, one count of being a felon in possession of a firearm and ammunition, and one count of using and carrying a firearm during a drug trafficking crime. The final three counts arose from Brown's arrest on March 5, 2012. In the present motion, Brown seeks to suppress the evidence obtained during that arrest. The court held a hearing on July 30, 2012. After considering the evidence and testimony of the witnesses, the court makes the following findings of fact for the purposes of this order.

1

On March 5, 2012, Deputies Christmas and Buenting of the Charleston County Sherriff's Office were traveling from North Charleston to West Ashley around 10:00 p.m. to deliver tickets to a state magistrate's office. The deputies saw a vehicle traveling a car length or less behind the car it was following. At the time Deputy Christmas saw the vehicle, he was driving a Chevy Tahoe[1] on a bridge with three lanes for each direction of traffic; the deputies were in the far left lane while the vehicle at issue was in the far right lane going in the same direction. Deputy Christmas testified that he was close enough to see that the car was traveling with "less than a car length in between his front bumper and the back bumper of the car in front of him."[2] The deputies discussed that the driver was committing a traffic violation and agreed to switch into the far right lane and effectuate a traffic stop once they got across the bridge.

Deputy Christmas turned on his blue lights and siren but the car did not stop for around a quarter mile, during which Deputy Christmas observed a liquid substance splash against the back window of the vehicle and both deputies noted that the two occupants

---

[1] Deputy Christmas, a K-9 handler, drives a Chevy Tahoe that is specially equipped for the K-9 unit and has extensive lighting. Deputy Buenting is also a K-9 handler and was riding with Deputy Christmas on March 5, 2012 for training purposes.

[2] Deputy Christmas further testified he was driving the Tahoe between 50 and 60 miles per hour when he observed the vehicle at issue traveling "way too close" behind the car it was following. While Deputy Christmas is skilled in estimating the speed that a vehicle is traveling within three miles per hour of the actual speed, in this case Deputy Christmas did not utilize his expertise in speed detection but instead stopped the vehicle for following too closely, which in his experience "is usually the main cause of vehicle wrecks." Although the Tahoe was located in the far left lane and the vehicle at issue was in the far right lane at the time of observation, Deputy Christmas testified that the lanes are "very close" and the Tahoe was only "a good two car lengths" to the left of the vehicle. In addition, Deputy Christmas stated that the Tahoe was traveling nearly parallel to the vehicle at issue but only "a car length and a half or so" behind; in other words, the Tahoe was essentially "right beside the car looking at it."

Deputy Buenting testified that he observed the vehicle following the one in front of it "within a car length or less than a car length," i.e., "very close." He confirmed that, in terms of driving parallel to one another, the Tahoe was "fairly close" and "just behind" the vehicle in question. The deputies were sequestered during their individual testimony.

were making "furtive movements," such as leaning down in their seats and digging into the center console. The car eventually came to a stop in a church parking lot. Deputy Buenting approached the passenger's side of the car to make initial contact with the occupants while Deputy Christmas positioned himself near the back door of the driver's side. Deputy Christmas spotted marijuana seeds on the back floorboard along with a digital hand scale in the back pocket of the passenger's seat.

Deputy Buenting asked Harold Austin, the driver, to step out and meet him at the back of the vehicle. The deputies conferred and confirmed that they both smelled recently-burned marijuana emanating from the open windows. Deputy Buenting explained to Austin why he was stopped and Austin acknowledged that he was not paying attention at the time he was observed following too closely. Deputy Buenting began to issue a warning ticket while Deputy Christmas reviewed the ownership documents for the vehicle and discovered that it was a rental car. Neither Austin nor Brown, the passenger, was listed on the rental agreement. Austin stated that he and Brown had recently traveled from North Carolina and were with some girls who may have smoked marijuana.

Deputy Christmas asked to search Austin, and Austin consented to a search of both his person and the vehicle. While checking the VIN number on the interior of the driver's side door, Deputy Christmas observed more marijuana seeds on the driver's side floorboard. Deputy Christmas also noticed that Brown, who remained in the passenger's seat, was clutching his left leg with his left hand to the extent that the deputy noticed tense muscles in Brown's arm. Also, Brown would not make eye contact with Deputy Christmas while they were engaged in conversation. Deputy Christmas then walked

around the vehicle and asked Brown to step out so he could start to search the vehicle, as is his practice when a search is going to take place. A baggie containing a white substance was seen sitting on the passenger's seat, which the deputies suspected, and was later confirmed, to contain cocaine.

As Brown hesitantly exited the vehicle, he explained that he was moving slowly because of hemorrhoids. Brown continued to clutch his left leg. Deputy Christmas asked Brown about the marijuana smell, marijuana seeds, and hand scale, and Brown responded that it was not his car. Brown then reluctantly gave consent for Deputy Christmas to search his person but kept his left hand pressed to his side. Deputy Christmas first searched the area where Brown's left hand was located and felt, based on his training and experience, an object consistent with a firearm. The firearm then fell down and out of Brown's pants, at which point he placed him under arrest.

The search revealed that Brown had a loaded .380 caliber Smith &Wesson pistol in his pants. A pat down of Brown's groin area further revealed that he was concealing a large lump between his buttocks, which a field test and subsequent laboratory analysis confirmed to be cocaine.[3] Brown was taken to the Charleston County Detention Center where he was strip searched and two more bags containing the traditional form of crack cocaine were discovered. After the traffic stop, Brown claimed ownership of the illegal substances found in the vehicle and on his person.[4]

---

[3] By concealing the cocaine between his buttocks, Brown has provided this court with an alternative definition of the term "crack" cocaine.

[4] The driver, Austin, was allowed to leave the scene with only a warning ticket for following too closely.

4

In this instant motion, Brown argues that the traffic stop was unconstitutional and that he did not consent to the search of his person; therefore, according to Brown, all evidence seized must be suppressed.

## **II. DISCUSSION**

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. At the suppression hearing, the court raised the issue of whether Brown has standing to challenge the stop under the Fourth Amendment. Because the court finds that Brown has standing, the court will proceed to determine first, whether there was probable cause to effectuate the stop, second, whether, under the totality of the circumstances, Brown voluntarily consented to the search, and, alternatively, third, whether Deputy Christmas had reasonable suspicion to conduct a pat down of Brown.

### **A. Standing**

Regardless of whether a passenger has a legitimate expectation of privacy in a searched vehicle, a passenger may challenge the stop and detention of a vehicle and argue that the evidence must be suppressed as the fruit of illegal activity. United States v. Ellis, 497 F.3d 606, 612 (6th Cir. 2007). In other words, a passenger of a vehicle possesses the same standing of the driver to challenge the constitutionality of a traffic stop. Arizona v. Johnson, 555 U.S. 323, 332 (2009); Brendlin v. California, 551 U.S. 249, 251 (2007); United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007) ("If a passenger is considered 'seized' for Fourth Amendment purposes when a police officer makes a traffic stop, that passenger may then challenge the constitutionality of the actions taken during

that stop."). Because Brown was a passenger in a vehicle subjected to a traffic stop and both the driver and Brown were seized, Brown has standing to challenge the constitutionality of the stop.

### B. Probable Cause

The court now turns to Brown's first contention, that the deputies lacked probable cause to stop the vehicle in which he was a passenger.

The automobile stop was clearly a "seizure" under the Fourth Amendment. See Whren v. United States, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."); United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011) ("When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment."). Because the stop was a seizure, the Fourth Amendment requires that it be "reasonable"; in turn, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 811.

Probable cause exists if, given the totality of the circumstances, the officer "had reasonably trustworthy information . . . sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). The court must examine the events leading up to the stop and decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation marks omitted). The touchstone of the probable cause

inquiry "remains one of reasonableness." United States v. Sowards, No. 10-4133, 2012 WL 2386605, at *5 (4th Cir. June 26, 2012). Of course, the requisite showing is less than that required by a preponderance of the evidence standard, Illinois v. Gates, 462 U.S. 213, 235 (1983), and the probable cause standard does not even "require that the officer's belief be more likely true than false." United States v. Humphries, 372 F.3d 653, 660 (4th Cir. 2004).

South Carolina law prohibits the driver of a motor vehicle from following "another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." S.C. Code Ann. § 56-5-1930(a). This "following too closely" statute places discretion in the hands of law enforcement officers and requires them to make a subjective judgment call. See United States v. Flores-Duran, No. 10-95, 2011 WL 780592, at *4 (E.D.N.C. Feb. 3, 2011), R&R adopted, 2011 WL 780172 (E.D.N.C. Feb. 28, 2011). But while the statute includes a "discretionary component," "[t]hat discretion . . . is not without limitation" because there "must be facts that support an officer's reasonable belief that probable cause exists to conclude a violation of the statute has occurred." Holloman v. City of Myrtle Beach, No. 04-1868, 2006 WL 4869353, at *6 (D.S.C. June 8, 2006).

The facts and circumstances known to Deputies Christmas and Buenting were sufficient to support an objectively reasonable belief that the driver of the car in which Brown was a passenger was following the vehicle in front too closely. The deputies cogently and consistently explained their observation that the vehicle was traveling within a car length or less from the vehicle in front of it. The deputies had a good vantage point from which to view the position of the two vehicles—nearly parallel to the

vehicle at issue and in a left hand lane that is "very close" to the right hand lane—and followed the vehicle down the bridge before effectuating a traffic stop. Deputy Christmas has experience in conducting thousands of traffic stops during his career and knows that following too closely is a major cause of accidents. The deputies observed the vehicle in which Brown was a passenger being driven at least 50 miles per hour over a bridge, at night, while following the car in front in a manner that was "way too close." After the stop, the driver, Austin, acknowledged to Deputy Buenting that he was not paying attention.

The Fourth Circuit's recent decision in United States v. Sowards, No. 10-4133, 2012 WL 2386605 (4th Cir. June 26, 2012), relied on by Brown, is distinguishable.[5] In Sowards, the district court found that a single officer's visual speed estimate alone—of a car traveling 75 miles per hour in a 70 mile per hour zone—was enough to establish probable cause to initiate a traffic stop. The Fourth Circuit reversed, holding that there were insufficient indicia of reliability to support a finding of probable cause for the stop. Id. at *6-8; see United States v. Mubdi, No. 10-5008, 2012 WL 3243478, at *4 (4th Cir. Aug. 10, 2012) ("Because the record [in Sowards] showed that the officer was, to put it mildly, measurement-challenged, we lacked confidence in his visual estimate, particularly given the modest five mile per hour differential between the posted speed limit and the defendant's alleged speed."). The court held,

> In the absence of sufficient additional indicia of reliability, an officer's visual approximation that a vehicle is traveling in slight excess of the legal speed limit is a guess that is merely conclusory and which lacks the necessary factual foundation to prove an officer with reasonably trustworthy information to initiate a traffic stop.

Sowards, No. 10-4133, 2012 WL 2386605, at *7.

---

[5] Sowards had not been decided at the time of the traffic stop in this case.

By relying on Sowards, Brown is attempting to fit a square peg into a round hole. The obvious difference between Sowards and this case is that the stop in Sowards was for driving too fast, while the stop here was for following too closely. In addition, the officer in Sowards was stationary when he saw a vehicle pass by, allegedly driving 75 miles per hour. Id. at *1. The court's concerns in Sowards were that the only justification for the stop was an estimate that a vehicle was traveling in "slight excess" of the speed limit, at a speed differential "difficult for the naked eye to discern." Id. at *6. These concerns are not present here, because two—not one—officers saw the car following "way too close" to the car in front of it as they followed the car across a bridge, traveling "essentially right beside the car looking at it." See Mudbi, No. 10-5008, 2012 WL 3243478, at *5 ("Unlike in Sowards, we have before us two independent and virtually identical estimates . . . . In our view, this tandem evidence alone provides sufficient corroboration to support a finding of probable cause . . . ." (footnote omitted)). Finally, the officer in Sowards was, in the Fourth Circuit's words, "measurement challenged," whereas the record here does not cast any doubt on the accuracy of the deputies' visual estimates. Id. Deputies Christmas and Buenting provided consistent, articulate testimony regarding the distance between the car in which Brown was a passenger and the car it was following, and the distance between Deputy Christmas's Tahoe and the car in which Brown was a passenger.

For these reasons, the deputies had a sufficient basis to conclude that the vehicle in which Brown was a passenger was not following the car in front of it in a reasonable and prudent manner. Because "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle," United States v. Branch,

9

537 F.3d 328, 335 (4th Cir. 2008), Brown's argument that the stop was in violation of the Fourth Amendment fails.

**C. Voluntary Consent**

The court now turns to Brown's second contention, that he did not provide voluntary consent to the search of his person and thus, the search was improper.

"A suspect's consent to search provides an exception to the Fourth Amendment's warrant and probable cause requirements." United States v. Ortiz, 669 F.3d 439, 445 (4th Cir. 2012); see United States v. Perrin, 45 F.3d 869, 875 (4th Cir. 1995) ("A defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant."). In assessing voluntariness of the consent, courts examine "the totality of the circumstances including factors such as the characteristics of the accused, his education and intelligence, the number of officers present, [and] the location and duration of the stop." Digiovanni, 650 F.3d at 514 (citing United States v. Lattimore, 87 F.3d 647, 651 (4th Cir. 1996)). The court must decide whether "a reasonable person in the suspect's position 'would have felt free to decline the officers' requests or otherwise terminate the encounter.'" United States v. Sullivan, 138 F.3d 126, 132 (4th Cir. 1998) (quoting Florida v. Bostick, 501 U.S. 429, 438 (1991)).

Before asking Brown for consent to search his person, Deputy Christmas requested that Brown get out of the vehicle. This request was reasonable because the driver, Austin, had already provided consent for the deputies to search the vehicle,[6] and Deputy Christmas testified that he never allows anyone to stay in a vehicle while a search is taking place due to safety concerns. Once Brown exited the vehicle and Deputy

---
[6] There is no issue as to whether the consent given by Austin was voluntary.

Christmas asked for consent to search his person, Brown did grant consent, albeit reluctantly. Brown's main argument as to why consent was not voluntarily given is that he did not give consent right away. But reluctantly-given consent is not necessarily involuntarily-given consent. Deputy Christmas asked for consent in a "laid back" manner; he asked for consent in public; he made no threats to Brown; and he did not brandish a weapon. In addition, there is no evidence that Brown did not understand Deputy Christmas's question or the nature of the request. These factors weigh in favor of a finding that consent was not coerced from Brown but instead voluntarily given. See United States v. Wilson, 895 F.2d 168, 172 (4th Cir. 1990). Although Deputy Christmas did not tell Brown that he could refuse consent, such a statement is not necessary. See Digiovanni, 650 F.3d at 514; United States v. Stinson, No. 11-4177, 2012 WL 626463, at *5 (4th Cir. Feb. 28, 2012) (finding that consent was voluntary under the totality of the circumstances in part because "no false or misleading statements were made by the police to suggest that [the defendant] could not refuse consent").

Viewing the circumstances in their totality, the court concludes that Brown voluntarily consented to the search of his person. "Once a defendant voluntarily gives consent, a search that falls within the scope of that consent is constitutionally permissible." Ortiz, 669 F.3d at 445. Brown has not argued or shown that a pat down of his person exceeded the scope of the consent given. The gun and cocaine seized from Brown during the search were validly acquired under the "plain feel" doctrine. See Maryland v. Dickerson, 508 U.S. 366, 375-76 (1993) (holding that when the contour or mass of an object makes its identity readily apparent, an officer may lawfully seize it).

Therefore, the search of Brown's person was in compliance with the Fourth Amendment, and the evidence was validly seized.

### D. Reasonable Suspicion

Finally, the government argues and the court agrees that even if Brown did not voluntarily consent to the search of his person, the officers still had reasonable suspicion to conduct the search.

The Supreme Court in Terry v. Ohio, 392 U.S. 1, 30 (1968), established that, consistent with the Fourth Amendment, an officer may conduct an investigatory stop and a pat down search of an individual when the officer has a reasonable suspicion that criminal activity may be afoot. Once a passenger has been asked to exit a vehicle, an officer may conduct a warrantless pat down search if, "under the totality of the circumstances, the officer has a reasonable, articulable suspicion that a person is involved in criminal activity and that he is armed." United States v. Raymond, 152 F.3d 309, 312 (4th Cir. 1998) (citing Terry, 392 U.S. 1).

A "reasonable, articulable suspicion is a particularized and objective basis for suspecting the person stopped of criminal activity." United States v. Smith, 396 F.3d 579, 583 (4th Cir. 2005) (internal quotation marks omitted). Courts consider the circumstances known to the officer at the time of the stop and the inferences he is entitled to draw from the facts in light of his experience, id., as well as what the officer learned as the stop progressed. United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009).

The circumstances known to the deputies at the time of the stop and what they observed as the stop progressed support a finding that Deputy Christmas had reasonable suspicion that Brown was engaged in criminal activity. After Deputy Christmas moved

into the right hand lane and turned on his blue lights to effectuate a traffic stop, the vehicle in which Brown was a passenger did not stop for close to a fourth of a mile, even though there were several places to stop. Deputy Christmas observed a liquid splash against the back window of the vehicle and the deputies noticed "furtive movements" by the two occupants. Upon approaching the vehicle, Deputy Christmas saw marijuana seeds in the back floorboard and driver's side floorboard and a digital hand scale in the back pocket of the passenger's seat. The deputies smelled recently-burned marijuana coming from inside of the vehicle. This all occurred prior to Deputy Christmas engaging Brown in conversation.

Deputy Christmas also noticed that Brown was tightly clutching his left leg and refusing to make eye contact. After Brown was asked to step out, Deputy Christmas observed a baggie containing a white substance sitting on the passenger's seat. Brown continued to clutch his left leg and moved slowly, claiming he was suffering from hemorrhoids. Based on his suspicions and law enforcement experience, Deputy Christmas proceeded to conduct a pat down of the area near where Brown was holding his left leg and felt a hard object consistent with a firearm. Deputy Christmas's suspicions were confirmed when the firearm fell down and out of Brown's pants.

Deputy Christmas had a reasonable, articulable suspicion that criminal activity was afoot based on the furtive movements, the observation of marijuana seeds and drug paraphernalia, and the smell of recently-burned marijuana. See United States v. Ramos, 443 F.3d 304, 309 (3d Cir. 2006) (finding reasonable suspicion to stop vehicle because identifiable marijuana odor coming from open car window made it reasonable for officers to suspect criminal activity was afoot). Deputy Christmas also had a reasonable,

articulable suspicion that Brown was armed due to the facts that Brown refused to make eye contact, hesitated to exit the vehicle, and suspiciously clutched his left leg both inside the vehicle and upon exiting.  See Raymond, 152 F.3d at 312 ("The troopers had a reasonable basis for conducting a patdown search of Raymond based on his strange exit from the car, as if he were attempting to conceal something under his jacket . . . .").  In such a scenario, officers are entitled to conduct a pat down for their safety.  United States v. Black, 525 F.3d 359, 366 (4th Cir. 2008).

Because there was a reasonable, articulable suspicion that criminal activity was afoot and that Brown was armed, Deputy Christmas did not violate Brown's constitutional rights in performing a pat down.  Therefore, the evidence was validly seized as the fruit of a constitutional search.

### III.   CONCLUSION

Based on the foregoing, the court **DENIES** defendant's motion to suppress.[7]

**AND IT IS SO ORDERED**.

                                                                    
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 27, 2012**
**Charleston, South Carolina**

---

[7] In the event that Brown conditionally pleads guilty to the charges against him, the court recognizes his right to appeal the denial of his motion to suppress.